UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

INTERNATIONAL ACTION CENTER,        :        05 Civ. 2880 (SHS)
                                          :

                   Plaintiff,      :

                                          :        <u>OPINION AND ORDER</u>

            -against-          :

                                          :

CITY OF NEW YORK,                  :

                                          :

                   Defendant.    :
----------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

      This action challenges the constitutionality of New York City's regulatory scheme for limiting the number of parades and marches on Manhattan's storied Fifth Avenue. Plaintiff International Action Center ("IAC") – an advocacy group that was denied permission to conduct a march protesting the Iraq war on a section of Fifth Avenue – contends that the City's parade permitting scheme is either: (a) an unconstitutional content-based regulation of speech or (b) an invalid time, place, or manner restriction on the availability of a public forum. In addition, IAC urges that the scheme violates the U.S. Constitution by imposing strict criminal liability on those who participate in parades unauthorized by the City.

      The parties now cross-move pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment on the validity of the City's parade regulations. As set forth more fully below, the regulation of Fifth Avenue parades is a content-neutral regulation because it applies equally to all proposed parades, regardless of their expressive content, and was adopted solely to limit congestion on Fifth Avenue. As a time, place or manner restriction on protected speech, it (1) serves a significant

government interest, (2) is narrowly tailored to address parade congestion on Fifth Avenue without significantly restricting speech unrelated to that congestion, and (3) leaves open alternative avenues for expression in New York City.  However, to the extent the regulation as administered by the City confers overly broad discretion on municipal officials as to which new parades will be permitted on Fifth Avenue, the regulation fails constitutional muster.  As a result, the City is enjoined from granting permits for new Fifth Avenue parades pursuant to N.Y.C. Admin. Code § 10-110(a)(4) unless the requested use fits within the four categories set forth in Rule 19-01(b) or any valid successor regulation.

## I.    FACTUAL BACKGROUND

The undisputed facts underlying this litigation are as follows.

### A.    The City's Regulation of Parades on Fifth Avenue

Pursuant to New York City Administrative Code § 10-110, the City has established a framework to regulate the use of city streets for parades and processions. (Plaintiff's Local Civil Rule 56.1 Statement of Material Facts ("Pl.'s 56.1") ¶ 2; Defendant's Response to Plaintiff's Local Civil Rule 56.1 Statement of Material Facts ("Def.'s Resp.") ¶ 2; Defendant's Local Civil Rule 56.1 Statement of Material Facts ("Def.'s 56.1") ¶ 1; Plaintiff's Response to Defendant's Local Civil Rule 56.1 Statement of Material Facts ("Pl.'s Resp.") ¶ 1.)  Title 38 of the Rules of the City of New York ("R.C.N.Y.") §§ 19-01 through 19-04 establishes guidelines and procedures governing the New York City Police Department's ("NYPD") processing of permit applications. (Def.'s 56.1 ¶ 2; Pl.'s Resp. ¶ 2.)

In relevant part, these rules require that applications for "parade routes including any portion of Fifth Avenue in the borough of Manhattan . . . must be filed with the office of the Chief of [the New York City Police] Department." (38 R.C.N.Y. § 19-03.) No parade on Fifth Avenue will be permitted between 15th and 114th Streets, however, "unless the parade was held at that location prior to the promulgation of these rules." (38 R.C.N.Y. §§ 19-02(e), 19-04(d)(viii).) Participation in an unauthorized parade is punishable by "a fine of not more than twenty-five dollars, or by imprisonment for not exceeding ten days, or by both such fine and imprisonment." (N.Y.C. Admin. Code § 10-110(c).)

The City's parade rules were enacted in 2001 and amended in 2007 (Def.'s 56.1 ¶¶ 5, 27; Pl.'s Resp. ¶ 5, 27); they continue a municipal policy banning "new" Fifth Avenue parades first implemented in 1971 (Def.'s 56.1 ¶ 14; Pl.'s Resp. ¶ 14). Prior to that date, the number of Fifth Avenue parades grew from ten in 1955 to fifteen in 1965 to eighteen in 1969. (Def.'s 56.1 ¶ 13; Pl.'s Resp. ¶ 13.) These parades were also among the City's largest – of the eighteen "major" parades held in the City in 1976, fifteen were conducted on Fifth Avenue. (Def.'s 56.1 ¶ 14; Pl.'s Resp. ¶ 14.) The prohibition of new Fifth Avenue parades was designed, according to the City, to relieve the "over-saturation" of these events in "one of the most congested sections of the City – midtown Manhattan." (Def.'s 56.1 ¶¶ 15, 27; Pl.'s Resp. ¶ 27.) Since 1998, thirty-four groups have applied for and been denied permits to hold "new" parades on Fifth Avenue. (Def.'s 56.1 ¶ 22; Pl.'s Resp. ¶ 22.)

Fifth Avenue nevertheless remains a well-traveled parade route, providing, as noted, the forum for fifteen of the City's eighteen largest annual parades. (Def.'s 56.1

¶¶ 17, 20; Pl.'s Resp. ¶¶ 17, 20.)  These parades are clustered in the fall and spring, when the City's weather is most conducive to outdoor activities: three parades take place per month in June, September and October, and two per month in March and May.  (Def.'s 56.1 ¶¶ 17, 20-21; Pl.'s Resp. ¶¶ 17, 20-21.)  In addition to the large parades, several smaller events also occur on portions of Fifth Avenue throughout the year.  (Def.'s 56.1 ¶ 19; Pl.'s Resp. ¶ 19.)

An exception to the ban on "new" Fifth Avenue parades is codified at section 10-110(a)(4), which authorizes the mayor to approve "[s]pecial permits for occasions of extraordinary public interest" allowing parades that are "not annual or customary" to occur on "any street or public place" in the city, including Fifth Avenue.  Rule 19-01 defines "occasions of extraordinary public interest" as "celebrations organized by the City honoring the armed forces; sports achievements or championships; world leaders and extraordinary achievements of historic significance."  Pursuant to this authority, the mayor permitted Fifth Avenue to be the site of the 2004 Olympic Torch Relay and a protest march against the Republican National Convention, also in 2004.  (Def.'s 56.1 ¶ 26; Pl.'s Resp. ¶ 26.)  In addition, the NYPD allowed a group called Shopping for Justice to march on Fifth Avenue without a permit in December 2006 (Def.'s 56.1 ¶ 24; Pl.'s Resp. ¶ 24), and a group of bicyclists known as Critical Mass were allowed to process along Fifth Avenue in October 2004 (Pl.'s 56.1 ¶ 13(c); Def.'s Resp. ¶ 13(c)).

B.      IAC's Proposed Fifth Avenue March

Founded in 1992 to oppose the first Gulf War, IAC is an association that currently organizes demonstrations, marches and other events addressing political issues.  (Pl.'s 56.1 ¶ 1; Def.'s Resp. ¶ 1; Am. Compl. ¶ 3.)  Over the past nine years, IAC has

conducted eleven parades in the City, all of which were authorized by permit and, in addition, it has held twenty-six demonstrations and rallies between 2003 and 2006. (Def.'s 56.1 ¶ 33; Pl.'s Resp. ¶ 33.)  Indeed, IAC has never been prevented from holding a parade or rally, nor has it ever been sanctioned for parading without a permit.  (Def.'s 56.1 ¶¶ 34-35; Pl.'s Resp. ¶¶ 34-35.)  It has, however, been denied permission to march on Fifth Avenue multiple times.  (Pl.'s 56.1 ¶ 10; Def.'s Resp. ¶ 10.)  Specifically, in 2005, IAC – in its capacity as a founder of the Troops Out Now Coalition – requested a permit to march on Fifth Avenue between 110th and 102nd Streets in connection with a rally to be held in Central Park protesting the war in Iraq.  (Pl.'s 56.1 ¶ 11; Def.'s Resp. ¶ 11.)  Although the City denied it access to Fifth Avenue on the grounds that new Fifth Avenue parades were not permitted, it did allow IAC to march along an alternate route to reach its Central Park rally.  (Pl.'s 56.1 ¶ 12; Def.'s Resp. ¶ 12.)

## II.    PROCEDURAL HISTORY

IAC has brought this action pursuant to 42 U.S.C. § 1983, alleging that the City's ban on new Fifth Avenue parades violates the First Amendment to the U.S. Constitution. At the commencement of the litigation, the City moved for summary judgment, contending that the Fifth Avenue ban is a valid time, place or manner restriction on the use of a public forum.  IAC, in turn, sought leave to amend its complaint.

In a Memorandum Order dated December 26, 2006, this Court denied the City's motion on the ground that the record did not at that time support a finding that the regulation was narrowly tailored to serve a compelling government interest.  Int'l Action Ctr. v. City of New York, No. 05 Civ. 2880, 2006 U.S. Dist. LEXIS 93387 (S.D.N.Y.

Dec. 26, 2006). The Court granted IAC's request to amend its complaint, and IAC filed an amended complaint on January 22, 2007.

The amended complaint broadened IAC's First Amendment challenge to the Fifth Avenue ban and also challenged the putative strict criminal liability imposed on those who participate in an unauthorized parade. Following the conclusion of discovery proceedings, the parties now cross-move for summary judgment in their respective favors pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## III. DISCUSSION

### A. Legal Standard

Summary judgment is appropriate only if the evidence shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); LaFond v. Gen. Physics Serv. Corp., 50 F.3d 165, 171 (2d Cir. 1995). When determining whether a genuine issue of material fact exists, the Court "is to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004); see also LaFond, 50 F.3d at 171.

Where, as here, both parties have moved for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001) (citing Schwabenbauer v. Bd. of Educ., 667 F.2d 305, 314 (2d Cir. 1981)).

B.    <u>The Ban on New Fifth Avenue Parades Is a Content-Neutral Regulation.</u>

Manhattan's Fifth Avenue, as all public roadways, is a traditional public forum for the expression of First Amendment rights.  <u>See</u> <u>Shuttlesworth v. Birmingham</u>, 394 U.S. 147, 152, 89 S. Ct. 935, 22 L. Ed. 2d 162 (1969).  As such, the City may regulate the public's access to and use of Fifth Avenue, so long as those regulations do not run afoul of Constitutional safeguards.  <u>See</u> <u>Johnson v. Bax</u>, 63 F.3d 154, 158 (2d Cir. 1995). When regulations of public fora are based on expressive content, they are "presumptively invalid" and upheld "only if they withstand strict scrutiny."  <u>Mastrovincenzo v. City of New York</u>, 435 F.3d 78, 98 (2d Cir. 2006).  Regulations that are content-neutral, however, are subject to a less exacting standard of review.  <u>Id.</u>  Thus, as an initial matter the Court must determine whether the ban on new Fifth Avenue parades is a content-based or content-neutral regulation.

IAC contends that the Fifth Avenue parade policy is a content-based regulation because, by prohibiting any new parades on Fifth Avenue, it discriminates against "new" expression in favor of traditional expression.  Under this theory, the regulations preserve Fifth Avenue for traditional, cultural parades and exclude new, more controversial expression from the forum.  In response, the City maintains that its ban on new Fifth Avenue parades is content neutral because it applies equally to all proposed parades, irrespective of their expressive content.  The ban exists, according to the City, solely to relieve congestion on Fifth Avenue in mid-town Manhattan by dispersing parades to other thoroughfares in the city.

The U.S. Supreme Court has held that "[t]he principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech

because of disagreement with the message it conveys." Ward v. Rock against Racism, 491 U.S. 781, 791, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989). In making this determination, "[t]he government's purpose is the controlling consideration." Id. Thus, the City's ban on new Fifth Avenue parades is content neutral, "'so long as it is justified without reference to the content of the regulated speech,'" Mastrovincenzo, 435 F.3d at 98 (quoting Hobbs v. County of Westchester, 397 F.3d 133, 149 (2d Cir. 2005)), and "'serves purposes unrelated to the content of expression,'" id. (quoting Ward, 491 U.S. at 791).

Pursuant to this standard, the City's ban on new Fifth Avenue parades is content neutral. The record evidence shows that the City first implemented its ban on new Fifth Avenue parades in 1971 because "at that time most of the major parades in the City were being held on Fifth Avenue" causing it to be "oversaturated with such events." (Decl. of Sam Centamore dated Aug. 13, 2007 ("Centamore Decl.") ¶ 6.) Thus, the City justified the ban out of concern that Fifth Avenue was in the process of being overwhelmed by parades. This justification does not turn on the content of the parades – i.e., no particular parade or type of parade caused the "oversaturation" – but rather on the sheer quantity of parades. Similarly, the purpose of the ban – preventing Fifth Avenue from having too many parades and marches in the future – is implicated by the mere existence of any additional Fifth Avenue parade, regardless of its subject matter, and therefore is unrelated to the content of speech.

IAC offers no evidence that avoiding the oversaturation of Fifth Avenue by parades was not in fact the City's justification for its parade regulations, and the record is utterly devoid of any evidence even squinting in the direction that the City's purpose in

banning new Fifth Avenue parades was the suppression of "new" speech or that the regulation arose in some fashion from the City's opposition to unconventional or non-traditional expression or the content of any particular parade or point of view.

IAC contends that the <u>effect</u> of the policy has nonetheless been to discriminate against "new" expression. This effect, however, is insufficient to render the policy content-based, because a "regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." <u>Ward</u>, 491 U.S. at 791; <u>see also</u> <u>Mastrovincenzo</u>, 435 F.3d at 98. By preventing new parades from taking place on Fifth Avenue, the City's regulations may indeed have an effect on some speakers but not others. This effect, however, is decidedly incidental to the purpose of limiting the number of parades on Fifth Avenue. Because that purpose is unrelated to expressive content, the ban's incidental effects do not detract from the regulation's content neutrality.

The U.S. Court of Appeals for the Second Circuit reached a similar conclusion when evaluating a First Amendment challenge to the City's vendor licensing scheme, which caps the number of licenses at 1979 levels. <u>Mastrovincenzo</u>, 435 F.3d at 83. Under that scheme, current license-holders are able to renew their licenses ahead of new applicants, resulting in "a substantial backlog of individuals seeking licenses." <u>Id.</u> Despite this negative effect on new applicants, the Second Circuit found the scheme content neutral because the purposes behind the regulation of street vendors – eliminating street congestion, maintaining the tax base, and preventing fraudulent sales – were unrelated to the content of the regulated expression. <u>Id.</u> at 99. While the licensing scheme "undoubtedly ha[d] incidental or harmful secondary effects" on the plaintiff

unlicensed street vendors of graffiti painted clothing, those secondary effects did not support a finding that the regulation was "content-based because it may still be justified without reference to the content of the regulated speech."  Id. (internal quotation marks omitted).  This reasoning applies with equal force to the City's Fifth Avenue policy and its incidental impact on new parades.

Accordingly, the Court finds that the City's ban on new Fifth Avenue parades is a content-neutral regulation.

C.  The City's Ban on New Fifth Avenue Parades Is a Valid Time, Place or Manner Regulation Except to the Extent that, as Administered, It Grants Overly Broad Discretion to Municipal Officials.

Content-neutral regulations governing the time, place, or manner of protected speech are valid so long as they (1) serve "a significant governmental interest," (2) are "narrowly tailored," and (3) "leave open ample alternative channels for communication of the information."  Ward, 491 U.S. at 791 (internal quotation marks omitted).  In addition, time, place, or manner regulations cannot survive constitutional review if they "confer overly broad discretion on the regulating officials."  Hous. Works v. Kerik, 283 F.3d 471, 478 (2d Cir. 2002) (citing Forsyth County v. Nationalist Movement, 505 U.S. 123, 130, 120 L. Ed. 2d 101, 112 S. Ct. 2395 (1992)).  The Court now considers whether the City's Fifth Avenue parade regulations comply with these requirements.  As set forth below, the ban on new Fifth Avenue parades survives constitutional scrutiny, except to the extent that section 10-110(a)(4) and Rule 19-01(b), as implemented by the City, grant the police commissioner and mayor unfettered discretion to permit exceptions to the ban.

*1.*     *A Significant Government Interest Supports the City's Fifth Avenue Regulation.*

The City asserts that its interest in limiting congestion on Fifth Avenue supports its rule prohibiting new Fifth Avenue parades.  In support of this position, the City has shown that Fifth Avenue bears a disproportionate share of the major parades that take place in New York City, serving as the forum for fifteen of the City's largest annual parades (Def.'s 56.1 ¶¶ 17, 20; Pl.'s Resp. ¶¶ 17, 20) and for eight out of the ten annual parades with more than 50,000 participants (Centamore Decl. ¶ 10).  These parades are compressed into a "five month warm weather period" such that Fifth Avenue hosts three parades per month in June, September and October, and two per month in March and May.  (Centamore Decl. ¶ 11; Def.'s 56.1 ¶¶ 17, 20-21; Pl.'s Resp. ¶¶ 17, 20-21.)  Several smaller events also occur on portions of Fifth Avenue throughout the year.  (Def.'s 56.1 ¶ 19; Pl.'s Resp. ¶ 19.)  In light of the congestion caused by these parades, the City adopted its ban to prevent new parades from further exacerbating this perceived problem.  (Centamore Decl. ¶ 6.)

It cannot be doubted that the City "has a significant interest in keeping its public spaces safe and free of congestion."  Bery v. City of New York, 97 F.3d 689, 697 (2d Cir. 1996); see also Mastrovincenzo, 435 F.3d at 83 ("[R]educing sidewalk and street congestion in a city with eight million inhabitants[] constitute 'significant governmental interests.'").  IAC, in fact, does not directly challenge the validity of that interest but contends instead that the City's interest neither extends along all of Fifth Avenue nor supports a distinction between old and new parades.  These critiques, however, address

whether the regulation is narrowly tailored to serve the City's interest, not whether the City has a significant interest in reducing Fifth Avenue congestion in the first instance.

IAC also relies on <u>Bery v. City of New York</u>, 97 F.3d 689 (2d Cir. 1996), for the proposition that numerous exceptions to a policy undermine the validity of the interest advanced by that policy. This reliance is misplaced, however, because such exceptions may call into question whether a regulation is narrowly tailored, not the validity of the underlying interest. <u>Id.</u> at 698 ("[T]he City's licensing exceptions for veterans and vendors of written material call into question the City's argument that the regulation is narrowly tailored.").

In sum, IAC offers no valid basis to refute the significance of the City's interest in mitigating Fifth Avenue congestion, and the Court is aware of none. It is manifest that a significant government interest – limiting congestion on Fifth Avenue – supports the City's ban on new Fifth Avenue parades.

### 2. *The Fifth Avenue Restriction Is Narrowly Tailored.*

To be narrowly tailored, a regulation need not be "the least restrictive or least intrusive means" of achieving the government's objective. <u>Mastrovincenzo</u>, 435 F.3d at 98 (internal quotation marks omitted). Rather, it need only promote a "substantial governmental interest that <u>would be achieved less effectively absent the regulation</u>." <u>Id.</u> (emphasis in original) (internal quotation marks omitted). The Second Circuit has explained that the "'essence of narrow tailoring' is having the regulation 'focus[] on the source of the evils the city seeks to eliminate . . . and eliminate[] them without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils.'" <u>Vincenty v. Bloomberg</u>, 476 F.3d 74, 84-85 (2d Cir. 2007)

(quoting Ward, 491 U.S. at 799 n.7).  Under this test, a municipal ban on the distribution of handbills, for example, would not be narrowly-tailored to a city's interest in reducing littering because "'a complete ban on handbilling would be substantially broader than necessary to achieve the interests justifying it.'"  Id. at 85 (quoting Ward, 491 U.S. at 799 n.7).

IAC maintains that the City's ban on new Fifth Avenue parades is substantially broader than necessary because the ban extends for five miles – from 15th Street to 114th Street – while the congestion that justifies the ban exists only in midtown, a much narrower section of Manhattan.  In support of this position, IAC observes that the City's stated reason for the new parade ban is "the over-saturation of such events in one of the most congested sections of the City – midtown Manhattan."  (Def.'s 56.1 ¶ 15.)  In addition, IAC has analyzed the parade routes of the fifteen major Fifth Avenue parades, and determined that with respect to Fifth Avenue: (1) none of the parades go above 86th Street, (2) only five go above 79th Street, (3) only four go below 42nd Street, and (4) only two go below 26th Street.  (Pl.'s 56.1 ¶ 9; Ex. B to Decl. of Jeffrey E. Fogel dated Aug. 20, 2007 ("Fogel Decl.").)  In light of its parade-route analysis and the City's stated purpose, IAC contends that the ban need extend only between 42nd and 59th Streets.

The City responds with an explanation for each slice of the 100-block long ban.  With respect to Fifth Avenue between 14th and 42nd Streets, the City points out that this area is "largely commercial" with "major cross-town thoroughfares [at] 14th and 34th Street[s] [which] are negatively affected by Fifth Avenue parades."  (Def.'s Reply at 8-9.)  Between 59th and 79th Streets, the ban is necessary because many of the large Fifth Avenue parades travel this route; indeed, eleven out of the fifteen largest parades march

at least as far as 72nd Street.  (Id. at 8.)  The impact of four of the City's largest parades

and the dispersal effects of three parades that end at 79th Street justify the ban between

79th and 86th Streets.  (Id. at 10; Decl. of Kevin O'Connor dated July 27, 2007

("O'Connor Decl.") ¶ 5.)  The stretch of Fifth Avenue between 86th and 96th Streets,

while not the actual line of march for any of the major parades, acts as the "dispersal

area" for four parades, and in that capacity, is closed off to traffic while the parades are in

progress.  (O'Connor Decl. ¶¶ 5-6.)  Finally, the ban on parades between 96th and 114th

Streets is necessary, according to the City, because a hospital, a health care facility and a

fire station lie along this route, and emergency access to these facilities would be

impeded by a parade.[1]  (O'Connor Decl. ¶ 8.)

    While the City's justifications do not necessarily persuade the Court that a 100-

block ban on new Fifth Avenue parades is absolutely necessary to reduce congestion in

midtown Manhattan, the City is not required to do so in order to show that its regulation

is narrowly tailored.  "The validity of time, place, or manner regulations does not turn on

a judge's agreement with the responsible decisionmaker concerning the most appropriate

method for promoting significant government interests or the degree to which those

interests should be promoted."  Ward, 491 U.S. at 800 (internal brackets and quotation

marks omitted).  Instead, the Court's task is simply to determine whether the regulations

"significantly restrict[] a substantial quantity" of speech unassociated with the harm

targeted – in this case, congestion in mid-town Manhattan.  Vincenty, 476 F.3d at 85.

    Particularly relevant to this determination is the Second Circuit's decision in

Housing Works v. Kerik, 283 F.3d 471 (2d Cir. 2002), that the City's ban on sound

---

[1] This rationale is consistent with City regulations discouraging parades that "will prevent proper fire and
police protection or ambulance service."  38 R.C.N.Y. § 19-04(d)(v).

amplification in City Hall Plaza is narrowly tailored to the government's substantial interest in insulating City Hall from disruptions caused by excessive noise. The court made this determination despite evidence showing that "the sound amplification system in City Hall Plaza can be adjusted to a degree that the sound cannot penetrate the City Hall building." Id. at 481. Even though this evidence demonstrated that a narrower restriction on speech would nevertheless allow the City to accomplish its objective, the court refused to substitute its opinion for that of the City, explaining that "[s]uch a substitution of opinion is not the business of the courts." Id.

Applying this precedent to the case at hand, the Court appreciates the force of IAC's argument that a 100-block ban is larger than necessary to insulate midtown Manhattan from the congestion associated with large parades. The Court is loath, however, to substitute its judgment for that of the City as to what restriction is necessary to relieve parade congestion along Fifth Avenue in midtown. And even if it were so inclined, IAC has not presented the Court with persuasive evidence showing that its proposed sixteen block ban – from 42nd to 59th Streets only – is adequate to accomplish the City's objectives in light of the heavy commercial activity south of 42nd Street and the parades and parade dispersal effects north of 59th Street.[2] The Court therefore cannot conclude that the 100-block ban imposes a significant restriction on a substantial quantity of speech and will not accept IAC's invitation to fine tune the City's policy.

Similarly, IAC urges that the City need not ban new parades to relieve congestion on Fifth Avenue. It proposes instead that the City cap the number of Fifth Avenue parade

---

[2] In opposition to the City's first motion for summary judgment, IAC suggested that the ban could be justified for thirty-six blocks, from 42nd to 79th Streets. (See IAC's Reply Mem. filed Sept. 16, 2005 at 6-7.) IAC now contends that the ban need be only half as long. The record, however, is devoid of evidence showing that either alternative would satisfactorily accomplish the City's purposes.

permits and then allocate them to parade applicants on a random basis. While this may strike IAC as producing a fairer allocation of parades, that consideration is irrelevant to the narrow-tailoring inquiry, which focuses only on whether the regulation imposes a significant restriction on a substantial quantity of speech unrelated to the harm justifying the regulation. See Vincenty, 476 F.3d at 85. Addressing a similar challenge to the City's vendor license system that similarly favored incumbents over new entrants, the Second Circuit refused to "second-guess a decision by the City Council . . . that [the City's] fixed-license system is appropriate or necessary." Mastrovincenzo, 435 F.3d at 100. This Court similarly refuses to second-guess the City's decision to ban new Fifth Avenue parades rather than cap and randomly allocate Fifth Avenue parade permits.[3]

IAC also identifies a group of exceptions to the Fifth Avenue parade ban that purportedly show that the regulation is not narrowly tailored. IAC's argument is premised on a passage in Bery v. City of New York, 97 F.3d 689, 698 (2d Cir. 1996), in which the Second Circuit observed that "the City's [vendor] licensing exceptions for veterans and vendors of written material call into question the City's argument that the regulation is narrowly tailored." The facts in Bery indicated that while the City had limited the total number of vendor licenses to 853, it had awarded an additional 340 licenses pursuant to its exception for veterans. Id. at 692. However, the existence of exceptions does not always prove that a regulation is not narrowly-tailored. In Housing Works, for example, the Second Circuit found the City's amplified sound ban narrowly

---

[3] Even if the City were to implement IAC's random-allocation scheme, the quantity of speech restricted would not change. While the permits would be allocated at random rather than according to the current old parade/new parade dichotomy, they would still limit the total number of parades allowed on Fifth Avenue. In addition, IAC's proposal fails to take into account the City's significant interest in reserving traditional dates and routes for parades that have become annual events. Gay Veterans Assoc. v. American Legion-New York County Organization, 621 F. Supp. 1510, 1516-17 (S.D.N.Y. 1985); see also Otway v. New York, 818 F. Supp. 659, 663 (S.D.N.Y. 1993).

tailored despite the existence of twelve exceptions over a twenty-year period. 283 F.3d at 480-81.

In this action, IAC contends that there have been four exceptions to the Fifth Avenue ban during the last six years.[4] This limited number of exceptions is comparable to those in <u>Housing Works</u> and therefore does not suggest a lack of narrow tailoring. In <u>Bery</u>, by contrast, the number of exceptions was far more substantial – there were nearly forty percent as many licenses issued pursuant to the exception as were issued under the scheme itself. The four exceptions to the Fifth Avenue ban on the record in this action, without more, are therefore insufficient to demonstrate that the regulation is not narrowly tailored.

Accordingly, the record shows that the City's ban on new Fifth Avenue parades between 15th and 114th Streets, while perhaps not the least restrictive regulation conceivable, does not restrict a substantial quantity of speech unrelated to the congestion that justifies the policy. The ban is therefore narrowly tailored.

   3.   *Adequate Alternative Channels Are Available under the Regulation.*

The City's ban on new Fifth Avenue parades must also "leave open sufficient alternative avenues of communication to minimize the effect on the quantity or content of the expression." <u>Vincenty</u>, 476 F.3d at 88 (internal brackets and quotation marks omitted). The fortuity of the "alternative avenues of communication" being literal avenues in this litigation is irrelevant for purposes of constitutional analysis, but the alternatives are nonetheless clear and broad: Seventh, Madison, Lexington, Broadway,

---

[4] IAC also refers to a "NASCAR Victory Lap" held "around midtown Manhattan" as a further exception to the City's policy. (Pl.'s 56.1 ¶ 15.) However, there is no evidence in the record that any portion of this event took place on Fifth Avenue.

and others throughout the City.  IAC's experience bears out the availability of alternative fora, as it has conducted eleven parades in the City not on Fifth Avenue over the past nine years, despite the ban on new Fifth Avenue parades.  (Def.'s 56.1 ¶ 33; Pl.'s Resp. ¶ 33.)

Nevertheless, IAC urges that Fifth Avenue is unique, providing the venue for nearly every major parade held in the City during the twentieth century.  "The First Amendment, however, does not guarantee [individuals] access to every or even the best channels or locations for their expression."  Carew-Reid v. Metro. Transp. Auth., 903 F.2d 914, 919 (2d Cir. 1990).  If a claim of uniqueness were sufficient to block a Court's determination that adequate alternative channels exist, few time, place, or manner regulations would withstand constitutional scrutiny.  As the Second Circuit recently explained, "[t]he requirement that 'ample alternative channels' exist does not imply that alternative channels must be perfect substitutes for those channels denied to plaintiffs by the regulation at hand; indeed, were we to interpret the requirement in this way, no alternative channels could ever be deemed 'ample.'"  Mastrovincenzo, 435 F.3d at 101.

Because the ban on new Fifth Avenue parades leaves open every other thoroughfare in the City for new parades, adequate alternative channels for expression are available under the regulation.

    *4.*    *Section 10-110(a)(4) and Rule 19-01(b), as Implemented by the City, Afford Overly Broad Discretion to Municipal Officials.*

The Court now turns to the final constitutional requirement imposed on time, place, or manner regulations – whether the regulation extends overly broad discretion to the government.  To be valid, "'a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain narrow, objective, and definite standards to guide the licensing authority.'"  Beal v. Stern, 184 F.3d 117, 124-25 (2d Cir.

1999) (quoting <u>Forsyth County</u>, 505 U.S. at 130-31). IAC contends that the Fifth Avenue

ban fails to meet this requirement because the City possesses overly broad discretion to

permit exceptions to the ban. Pursuant to New York City Administrative Code § 10-

110(a)(4), the City may issue a special permit "for occasions of extraordinary public

interest, not annual or customary, or not so intended to be." Such a special permit "may

be granted by the commissioner for any street or public place, and for any day or hour,

with the written approval of the mayor," N.Y.C. Admin. Code § 10-110(a)(4), and

therefore constitutes an authorized exception to the ban on new Fifth Avenue parades.

According to IAC, the City exercises its special-permit authority to allow new Fifth

Avenue parades based on an impermissible content-based assessment of merit.[5]

In support of its position, IAC points to two events authorized by the mayor

pursuant to section 10-110(a)(4)'s exception to the ban on new Fifth Avenue parades.[6]

The first event, the Olympic Torch Relay, was held on June 19, 2004. (Pl.'s 56.1 ¶ 13(a);

Def.'s Resp. ¶ 13(a).) A special permit authorized by the mayor allowed the relay to pass

along two lengths of Fifth Avenue: from 125th to 79th Streets and from 59th to 46th

Streets. (<u>Id.</u>; Ex. R to Fogel Decl.) Later that year, the City issued another special

permit, this time for a protest march organized by a group called United for Peace and

Justice ("UPJ"). (Pl.'s 56.1 ¶ 13(b); Def.'s Resp. ¶ 13(b).) This special permit allowed

the march, which protested the Republican National Convention then being held in the

---

[5] Asserting that IAC has never filed a request for a "special permit" – although it concedes that IAC has
frequently applied for regular permits – the City questions whether IAC has standing to challenge this
provision of the parade regulations. This question is easily answered in the affirmative, as "there is no need
for a party actually to apply or to request a permit in order to bring a facial challenge to an ordinance (or
parts of it) on the ground that the ordinance gives the regulating entity unbridled discretion." <u>MacDonald
v. Safir</u>, 206 F.3d 183, 189 (2d Cir. 2000). Accordingly, IAC has standing to challenge the provision.
[6] IAC further objects to a Critical Mass bicycle procession in 2004 and a 2006 march by Shopping for
Justice that were allowed to pass along Fifth Avenue, but the record does not indicate that these events
were authorized pursuant to N.Y.C. Admin. Code § 10-110(a)(4). (<u>See, e.g.</u>, Pl.'s 56.1 ¶ 13(c)-(d); Def.'s
Resp. ¶ 13(c)-(d).)

City, to proceed along Fifth Avenue from 34th to 23rd Streets. (Id.; Ex. S to Fogel Decl.; Def.'s 56.1 ¶ 26; Pl.s' Resp. ¶ 26.) The City defends both of these special permits as products of valid exercises of its discretion pursuant to section 10-110(a)(4). (Def.'s 56.1 ¶ 26.)

This Court is not the first to consider the validity of the special permit provision codified at section 10-110(a)(4). In 2000, in MacDonald v. Safir, the Second Circuit determined that the language of section 10-110, "standing alone," was not "'sufficiently precise'" to withstand constitutional scrutiny. 206 F.3d 183, 192 (2d Cir. 2000) (quoting Turley v. Police Dep't of New York, 167 F.3d 757, 762 (2d Cir. 1999)). That court went on to write that "§ 10-110(a)(4), which permits the Commissioner to grant a parade permit for any 'occasion[] of extraordinary public interest, not annual or customary,' unless constrained by administrative construction or by well-established practice, appear[s] to afford the Commissioner exactly the sort of discretion that has been found to violate the First Amendment." 206 F.3d at 192 (quoting N.Y.C. Admin. Code § 10-110(a)(4)). Based on the incompleteness of the appellate record, the Second Circuit panel in Kerik remanded the case to the district court to determine whether the City's discretion was sufficiently constrained by rule or practice, ordering "the submission of further evidence – by both sides – regarding the Commissioner's practices and guidelines associated with parade permitting under § 10-110." Id.

In response, the City in 2001 enacted Rule 19-01(b) defining "occasions of extraordinary public interest" as "celebrations organized by the City honoring the armed forces; sports achievements or championships; world leaders and extraordinary achievements of historic significance." 38 R.C.N.Y. § 19-01(b). Thus, an "occasion[] of

extraordinary public interest" is a "celebration[]" that (1) is "organized by the City" and (2) honors either (a) "the armed forces," (b) "sports achievements or championships," (c) "world leaders," or (d) "extraordinary achievements of historic significance."  Rule 19-01(b) remains extant today.

This rule was subsequently challenged and upheld in <u>Five Borough Bicycle Club v. City of New York</u>, 483 F. Supp. 2d 351 (S.D.N.Y. 2007).  In that action, the plaintiffs "claimed that the [special-permit] exception has been applied to allow events that do not fit within the language of Section 19-01(b) to take place on a Fifth Avenue, thus rendering the exception meaningless and susceptible to arbitrary application."  <u>Id.</u> at 377.  In support of their argument, they urged – as IAC does here – that the City's grant of a special permit for the Olympic Torch Relay is incompatible with Rule 19-01(b).  <u>Id.</u>  Judge Lewis A. Kaplan disagreed, finding that "[i]t would not be unreasonable to consider a relay honoring one of the most revered athletic traditions in the world a 'celebration[] . . . honoring sports achievements.'"  <u>Id.</u> (quoting 38 R.C.N.Y. § 19-01(b)).

This Court agrees with that assessment, both with respect to the particular issue of the Olympic Torch Relay and the broader question of the validity of Rule 19-01(b).  As written, Rule 19-01(b) is unobjectionable.  By defining and limiting "occasions of extraordinary public interest" to celebrations "honoring the armed forces; sports achievements or championships; world leaders and extraordinary achievements of historic significance," 38 R.C.N.Y. § 19-01(b), Rule 19-01(b) appears by its text to provide "narrow, objective, and definite standards to guide the licensing authority," <u>Beal</u>, 184 F.3d at 125, in determining whether or not a new parade is entitled to a special permit to march down Fifth Avenue.

IAC contends, however, that in practice, the City issues special permits without regard to Rule 19-01(b).  As proof of this practice, IAC points to a "massive protest march against the Republican National Convention" organized by UPJ in 2004, for which the City issued a special permit for a march along Fifth Avenue pursuant to section 10-110(a)(4).  (Pl.'s 56.1 ¶ 13(b); Def.'s Resp. ¶ 13(b); Def.'s 56.1 ¶ 26; Pl.'s Resp. ¶ 26; Ex. S to Fogel Decl.)[7]

The City makes no effort to fit the UPJ special permit within the requirements of Rule 19-01(b), and the record is utterly devoid of any evidence showing that the protest march was (1) "organized by the City" or (2) that it honored "the armed forces," "sports achievements or championships," "world leaders" or "extraordinary achievements of historic significance" as required by Rule 19-01(b).  Instead, the City contends that the UPJ special permit was properly issued pursuant to section 10-110(a)(4) despite the fact that UPJ's protest march did not fit within Rule 19-01(b).  From the City's perspective, although UPJ's special permit to march on Fifth Avenue did not fit within Rule 19-01(b), the UPJ special permit was "consistent with both the spirit and intent of § 10-110(a)(4)" and justified in light of "the time constraints of planning the major event in such a short time period."  (Def.'s Reply Mem. at 15; Decl. of Anthony Crowell dated Aug. 8, 2007 ¶ 8.)  Thus, the City asserts that it is authorized to issue special permits for new Fifth Avenue parades pursuant to section 10-110(a)(4) regardless of whether those parades

---

[7] The UPJ march was not before the court in <u>Five Borough Bicycle</u>.  While the <u>Five Borough Bicycle</u> plaintiffs complained of other permits authorizing "a peace march and a demonstration in connection with the shooting of an individual named Sean Bell," the district court found that it had "no basis from which to conclude that these events occurred or, if they did, that they either were granted special permits or took place on Fifth Avenue without permits and without police interference."  483 F. Supp. 2d at 377.  As a result, Judge Kaplan "disregard[ed] the claims about these events."  <u>Id.</u>

actually fit within Rule 19-01(b), so long as they comport with the "spirit and intent" of section 10-110(a)(4).

Indeed, the record shows that the City has not followed the standards set forth in Rule 19-01(b) when issuing special parade permits.  The City authorized one Fifth Avenue protest march – UPJ's protest against the Republican National Convention – and denied another – IAC's protest against the war in Iraq – even though neither fit within the parameters of Rule 19-01(b): neither was "organized by the City" and neither honored any of the four categories of honorees.  The fact that municipal officials determined that the former was an "occasion[] of extraordinary public interest" – and therefore entitled to a special permit to march on Fifth Avenue – while the latter was not constitutes a content-based distinction, in which the City did not act as if its discretion was constrained by any rule, practice, or guideline.

Because Rule 19-01(b) does not function as a constraint on the City's discretion to issue special parade permits pursuant to section 10-110(a)(4) and the record does not suggest the existence of any other such constraint, this Court finds that the City's power to determine what events constitute "occasions of extraordinary public interest" is effectively unconstrained.[8]  This discretion, unbounded by "administrative construction or by well-established practice" is precisely what the Second Circuit found objectionable in MacDonald.  206 F.3d at 193.  Here, the City has "effectively discriminate[d] against certain viewpoints, the existence of standards notwithstanding."  Beal, 184 F.3d at 126 n.6.

---

[8] In contrast, the Second Circuit determined that a policy sufficiently limited official discretion where "City officials have not exercised their discretion beyond the limits announced by the City policy, and have designated ticker-tape parades only for the limited purpose of honoring heroes, athletes, soldiers, visiting dignitaries, and statesmen."  Hous. Works, 283 F.3d at 480.

This Court concludes therefore that despite the limiting language of Rule 19-01(b), the City's implementation of section 10-110(a)(4) affords it overly broad discretion to grant exceptions to the new Fifth Avenue parade ban in violation of the First Amendment. IAC's motion for summary judgment on whether the City's new Fifth Avenue parade ban violates the First Amendment is granted on that basis.

D.     IAC Lacks Standing to Challenge the Prohibition on Individuals' Participation in Parades Lacking Permits.

IAC also challenges N.Y.C. Admin. Code § 10-110(c), which punishes participation in an unauthorized parade by imposing "a fine of not more than twenty-five dollars, or by imprisonment for not exceeding ten days, or by both such fine and imprisonment" on participants. IAC contends that this provision establishes strict liability for violating the City's parade permitting scheme and therefore violates the First Amendment. The City resists IAC's challenge on the ground that IAC lacks standing to bring this claim on behalf of third-party parade participants.

IAC, as an organization, is fully able to bring suit on its own behalf "for injuries it has sustained," Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 174 (2d Cir. 2005), so long as those injuries – or threats of injury – are "both 'real and immediate,' [and] not 'conjectural' or 'hypothetical.'" Bordell v. General Electric Co., 922 F.2d 1057, 1060 (2d Cir. 1991) (quoting City of Los Angeles v. Lyons, 461 U.S. 95, 101-02, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983)); see also Field Day, LLC v. County of Suffolk, 463 F.3d 167, 175 (2d Cir. 2006) ("[E]vent organizers have First Amendment rights and have standing to protect those rights."). IAC does not allege, however, that section 10-110(c) has caused it any such injury. IAC does not claim to have been fined or otherwise sanctioned, or so threatened; nor does it allege that it has

been deterred from organizing events out of a fear of sanctions.  Indeed, IAC does not

allege that it, as an organization, is even subject to being penalized pursuant to

section 10-110(c).

Instead, IAC brings this claim out of concern for others who "may be deterred

from joining IAC-organized marches due to the chilling effect caused by § 10-110(c)."

(Pl.'s Reply at 13.)  Leaving aside the question of whether this concern constitutes a

direct injury to IAC, it is nonetheless a purely hypothetical injury incapable of conferring

standing to bring this action.  As the Second Circuit has explained:

> Allegations of a subjective chill of First Amendment rights are not an
> adequate substitute for a claim of specific present objective harm or a
> threat of specific future harm.  Rather, to establish standing in this manner,
> a plaintiff must proffer some objective evidence to substantiate his claim
> that the challenged regulation has deterred him from engaging in protected
> activity.

Latino Officers Ass'n v. Safir, 170 F.3d 167, 170 (2d Cir. 1999) (internal citation,

brackets and quotation marks omitted).  IAC has not offered any "objective evidence"

substantiating its claim that section 10-110(c) chills individuals from participating in

IAC-sponsored events.  Therefore, IAC has no basis to challenge section 10-110(c) on its

own behalf.

Organizations may also bring suit on behalf of their members pursuant to the

doctrine of associational or organizational standing.  "Under New York and federal law,

an organization may sue as a representative of its members only if the members have

standing to sue in their own right."  Mid-Hudson, 418 F.3d at 173 (internal quotation

marks omitted).  IAC does not contend, however, that it is suing on behalf of its

members.  Indeed, IAC "is not a membership organization" (Pl.'s Reply at 14 n.7; Ex. C

to Second Decl. of Jeffrey E. Fogel dated Sept. 24, 2007), and therefore has no basis to assert associational standing.

Finally, third-party standing may be available if IAC can show "(1) injury-in-fact, (2) causation, and (3) redressability, . . . [as well as] a close relation to the injured third party and a hindrance to that party's ability to protect its own interests." Mid-Hudson, 418 F.3d at 174 (internal quotation marks omitted). This theory of standing is nevertheless unavailable here – even if IAC could show an injury-in-fact – because IAC has not demonstrated a "hindrance" to the ability of third-parties to protect their own interests.

IAC urges that standing requirements are relaxed in First Amendment cases to permit litigants unaffected by government regulations to challenge them facially on behalf of others. In support of this proposition, IAC relies on caselaw addressing First Amendment overbreadth doctrine, which authorizes individuals "to challenge a statute on its face because it . . . threatens others not before the court – those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution." Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 503, 105 S. Ct. 2794, 86 L. Ed. 2d 394 (1985). This "slender exception to the prudential limits on standing" is of no help to IAC because it "does not affect the rigid constitutional requirement that plaintiffs must demonstrate an injury in fact to invoke a federal court's jurisdiction." Bordell, 922 F.2d at 1061. Instead, overbreadth doctrine permits "those who have suffered some cognizable injury, but whose conduct is not protected under the First Amendment, to assert the constitutional rights of others." Id.

The Second Circuit recently explained in <u>Farrell v. Burke</u> that "a party [may] bring an overbreadth challenge where that party satisfies the Article III requirement of injury-in-fact, and where it can be expected satisfactorily to frame the issues in the case." 449 F.3d 470, 499 (2d Cir. 2006) (internal brackets and quotation marks omitted). In <u>Farrell</u>, a parolee was permitted to bring an overbreadth challenge to a parole condition barring pornography because his violation of that condition resulted in the revocation of his parole. The Second Circuit explained that the revocation of Farrell's parole "was clearly an injury-in-fact, and there is no question that he is thus well-suited to frame satisfactorily the issues in this case." <u>Id.</u> As a result, he was permitted to challenge the parole condition by "claim[ing] that although a statute did not violate his . . . First Amendment rights, it would violate the First Amendment rights of hypothetical third parties if applied to them." <u>Id.</u> at 498.

Here, by contrast, IAC has suffered no injury-in-fact; it simply desires to litigate on behalf of others. Overbreadth doctrine, then, does not cure IAC's lack of standing to challenge section 10-110(c) in this action. The City's motion for summary judgment dismissing IAC's section 10-110(c) claim is therefore granted.

## IV. CONCLUSION

For the reasons set forth above, the Court grants IAC's motion for summary judgment insofar as the Court concludes that N.Y.C. Admin. Code § 10-110(a)(4) and Rule 19-01(b), as implemented by the City, afford municipal officials unconstitutionally broad discretion to grant exceptions to the Fifth Avenue new parade ban. Accordingly, the City is hereby enjoined from granting permits for new Fifth Avenue parades pursuant to N.Y.C. Admin. Code § 10-110(a)(4) unless the requested use fits within the four

categories set forth in Rule 19-01(b) or any successor regulation that passes constitutional muster. IAC's motion for summary judgment is otherwise denied.

The City's motion for summary judgment is granted to the extent of dismissing for lack of standing IAC's First Amendment challenge to N.Y.C. Admin. Code § 10-110(c), which prohibits participating in a parade unauthorized by permit, but is otherwise denied.

Dated: New York, New York
November 27, 2007

SO ORDERED:

Sidney H. Stein, U.S.D.J.